UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
DEMOS P. DEMOPOULOS, VICTOR
CASTELLANO, VINCENT THEURER
and JEFF HAMMOND, as Trustees and
Fiduciaries of the LOCAL 553
PENSION FUND; and as Trustees and
Fiduciaries of the LOCAL 553
DEFERRED COMPENSATION FUND;
and as Trustees and Fiduciaries of the
LOCAL 553 BENEFITS FUND,

**MEMORANDUM AND ORDER**
Case No. 19-cv-5289 (FB) (RML)

          Plaintiffs,

     -against-

UNITED METRO ENERGY CORP.,
UNITED APOLLO PETROLEUM
TRANSPORTATION CORP., and
UNITED APOLLO TRANSPORTATION
CORP.,

          Defendants.
-----------------------------------------------x

*Appearances:*
*For the Plaintiffs:*
WILLIAM ANSPACH
LEO GERTNER
Friedman & Anspach
1500 Broadway, Suite 2300
New York, NY 11036

*For the Defendants:*
ANA GETIASHVILI
JONATHAN D. FARRELL
MARK A. RADI
Meltzer, Lippe, Goldestein &
Breistone, LLP
190 Wllis Avenue
Mineola, NY 11501

**BLOCK, Senior District Judge:**

     In this Employee Retirement Income Security Act ("ERISA") case,

Plaintiffs, the Trustees and Fiduciaries of the Local 553 Pension Fund, the Local

553 Deferred Compensation Fund, and the Local 553 Benefits Fund (collectively, "Plaintiffs" or the "Funds") seek an audit of the records of Defendants United Metro Energy Corp. ("UMEC"), United Apollo Petroleum Transportation Corp. ("UAP"), and United Apollo Transportation Corp. ("UAT") to determine whether Defendants owe delinquent contributions on behalf of covered employees under a multiemployer collective bargaining agreement ("CBA"). Both parties move for summary judgment. For the following reasons, Plaintiffs' motion for an audit is granted, and Defendants' motion is denied.

## I.    BACKGROUND

### A. Legal Standards

The following facts are taken from the pleadings, the parties' Rule 56.1 statements, and the supporting documentation. The facts are undisputed unless otherwise noted. A moving party is entitled to summary judgment when it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When both parties move for summary judgment, the Court examines each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).

## B. The Parties, Union, and Master Contract

This case is the latest salvo in a long war of attrition between the Funds,

Local 553, International Brotherhood of Teamsters, ("the Union"), and Defendants

over Defendants' alleged obligations under a multiemployer CBA involving fuel

and heating-oil delivery drivers (the "Master Contract.")[1]  The Funds are employee

benefit plans established pursuant to CBAs between the Union and employers that

operate pursuant to Trust Agreements and provide pension, deferred compensation,

and other benefits.

This dispute largely turns on whether Defendants are subject to Funds

obligations under the Master Contract.  The Union has two relevant multiemployer

CBAs: (1) the Master Contract, covering drivers performing residential or retail

---

[1] This Court has already seen substantially the same contractual dispute between the Union, the Plaintiffs, and the Defendants in three dockets.  First, UMEC moved to stay the Union's requested arbitration as to interpretation of the 2017 Memorandum of Agreement.  *See, e.g.*, *United Metro Energy Corp. v. Loc. 553, I.B.T.*, No. 1:22-CV-00151-FB-RLM, 2022 WL 2390993, at *1 (E.D.N.Y. July 1, 2022) (enforcing arbitration clause as to whether drivers are covered by the Bulk Contract or Master Contract).  Second, the Union moved to vacate the ensuing arbitration award.  *See Loc. 553, I.B.T v. United Metro Energy Corp et al*, No. 23-cv-2219 (FB)(RML) (E.D.N.Y. June 30, 2023) (confirming arbitration award).  Third, in this ERISA case, the Court has already written two opinions, first granting Plaintiffs' motion to amend their complaint, and then denying Defendants' motion for reconsideration.  *See Demopoulos v. United Metro Energy Corp.*, No. 119CV05289FBRLM, 2022 WL 2390986, at *1 (E.D.N.Y. July 1, 2022), *reconsideration denied*, No. 19CV5289FBRLM, 2023 WL 2683012 (E.D.N.Y. Mar. 29, 2023).

work, i.e., smaller deliveries with stops at multiple locations, and (2) the "Bulk Contract," covering drivers performing the delivery of "bulk" work, i.e., large or full fuel loads to one or two stops.  The Master Contract is more favorable for drivers because it provides higher pay rates and, unlike the Bulk Contract, requires employers to make Funds contributions for covered work.  The Master Contract incorporates the Trust Agreement and provides a right to audit "whenever such examination is deemed necessary or advisable by the Trustees."

In 2013, Defendant UMEC purchased the assets of a company called Metro, which was in bankruptcy.  Metro was composed of two companies — Apollo Petroleum Transportation, Inc. ("Apollo 1") and Apollo Petroleum Transportation, LLC ("Apollo 2") — and had employed drivers covered by both the Master and Bulk Contracts.  Mirroring this structure, UMEC created UAT and UAP.[2]

After the asset purchase, Defendants continued to employ three employees formerly employed by Apollo 1 and about fifty drivers employed by Apollo 2. While Defendants ultimately executed the 2013-17 and 2017-21 Bulk Contracts, the parties dispute whether, and to what extent, Defendants adopted the Master

---

[2] The parties contest the relationship between Defendants because, Plaintiffs argue, they are alter egos.  For the sake of brevity, the Court will refer to "Defendants" in the following discussion while noting that Defendants dispute which entity was involved in what.

4

Contract with their conduct.  Although Defendants never signed the Master

Contract, it is uncontested that Defendants continued to provide the three Apollo 1

employees previously under the Master Contract — John Spaight ("Spaight"),

Thomas Galasso ("Galasso") and Paul Senatore ("Senatore") — with the Master

Contract's pay and benefits and submitted Funds contributions and remittance

reports on their behalf.  These contributions and payments continued until Spaight

moved to management in 2013, and Galasso and Senatore retired in June 2013 and

May 2015, respectively.  For around two years, Defendants made no Funds

contributions, although Plaintiffs intimate that Defendants should have been

making contributions because drivers were performing covered work under the

Master Contract.   By 2017, Plaintiffs estimate there were at least five drivers

performing work covered by the Master Contract.

In July 2017, UMEC and the Union signed a Memorandum of Agreement

("MOA") extending the Bulk Contract and stating in Paragraph 11:

> The Employer shall honor and be bound by and execute the Local 553
> Fuel Industry Master Contract as of March 1, 2017, expiring
> December 15, 2019, which shall initially cover five (5) Drivers
> performing retail delivery work who shall be chosen be seniority from
> the current bulk seniority list.

After signing the MOA, Defendants submitted remittance reports and paid

Funds contributions for the initial five drivers until January 2020.

## C. Litigation History

Plaintiffs commenced this litigation in 2019, seeking an audit and alleging that when the Funds' auditors sought to conduct a payroll compliance audit in July 2019, Defendants refused to produce necessary documents.  Concerned that Defendants had not fully reported work covered by the Master Contract, the auditors determined that a full audit from March 1, 2013, through December 31, 2018, was necessary.  Defendants refused to produce the relevant records.

The MOA also gave rise to separate litigation, involving the Union, rather than the Funds, and UMEC.  After two of the initial five retail delivery drivers covered by the Master Contract retired, the Union requested that UMEC apply the Master Contract to the next two most senior retail delivery drivers.  When UMEC refused, the Union filed a grievance in 2020. UMEC refused to arbitrate, instead initiating litigation before this Court to enjoin arbitration.  This Court granted the Union's Rule 12(b)(6) motion to dismiss, finding that the matter must be submitted to arbitration pursuant to agreements between the Union and UMEC.  *See United Metro Energy Corp. v. Loc. 553, I.B.T.*, No. 1:22-CV-00151-FB-RLM, 2022 WL 2390993 (E.D.N.Y. July 1, 2022).

In February 2023, Arbitrator Howard C. Edelman issued an award

6

(the "Arbitration Award") that found that this disputed language required

UMEC only to pay the Master Contract rates, as an initial matter, to the five

drivers who make retail deliveries and denied the Union's grievance.

The Union moved to vacate the Award before this Court. However,

on June 30, 2023, under a deferential standard of review, the Court

confirmed the Award's determination that the MOA "did not require

[UMEC] to pay all retail delivery drivers in accordance with the rates set out

in the Master Contract, only that five of them who did engage in retail work

receive higher pay." *See Loc. 553, I.B.T v United Metro Energy Corp. et al*,

Docket No. 23-cv-2219 (FB) (RML) (E.D.N.Y. June 30, 2023).

## II. DISCUSSION

### A. Whether Defendants Adopted the Master Contracts

The primary issue is whether, and to what extent, Defendants adopted the

Master Contracts, which require Funds contributions and, by incorporating the

Trust Agreements, provide audit rights. *See Trustees of the Sheet Metal Workers'*

*Nat. Pension Fund v. Steel & Duct Fabrication, Inc.*, 124 F. Supp. 3d 187, 196

(E.D.N.Y. 2015) (trustees have audit rights under contractual language and law of

employee benefit plans) (citing *Central States, Southeast and Southwest Areas*

*Pension Fund v. Central Transp.*, Inc., 472 U.S. 559, 569, 571–73, 581 (1985)).

7

### 1. *2010-13 and 2013-16 Master Contracts*

While both parties agree that, before the 2017 MOA, Defendants never signed the Master Contracts or another document, they disagree as to whether Defendants adopted the Master Contracts through their conduct, which would require Defendants to make Funds contributions for covered work.  The Court concludes that Defendants adopted the 2010-13 and 2013-16 Master Contracts with their conduct.[3]

A party need not sign a CBA to have an obligation to make ERISA plan obligations.  *See Brown v. C. Volante Corp.*, 194 F.3d 351, 355 (2d Cir. 1999) (61 remittance reports, employer's cooperation with the audit, payment of union wages to employees, employer's letter to the Trustees acknowledging appellant's "responsibility to the funds," are sufficient, absent contrary evidence, to establish as a matter of law employer's intent to adopt the two unsigned CBAs).  Instead, a court must examine surrounding circumstances and the conduct of the parties to ascertain the parties' intent to be bound to a CBA.  *See Bricklayers Ins. & Welfare Fund Bricklayers Pension Fund v. P.P.L. Constr. Servs. Corp.*, No. 12-CV-3940 DLI RML, 2015 WL 1443038, at *5 (E.D.N.Y. Mar. 27, 2015) (collecting cases).

---

[3] During the relevant period, the Master Contracts were negotiated every three years.

8

Relevant indicia of a party's intent to be bound to a CBA include making Funds contributions, timely filing remittance reports, remitting union dues, submitting to an audit by the union, and paying CBA wages and benefits.  *See id.*; *see also Trustees of Loc. 7 Tile Indus. Welfare Fund v. Goal Enterprises, Inc.*, No. 20-CV-1958 (KAM) (RER), 2022 WL 17820088, at *4 (E.D.N.Y. July 6, 2022).

Plaintiffs have established, as a matter of law, that Defendants adopted the 2010-13 and 2013-16 Master Contracts through their conduct.  Specifically, they provide extensive evidence that: (1) Defendants submitted 31 monthly remittance reports that refer to the Trust Agreements governing the Funds; (2) Defendants paid Funds contributions at the rates specified in the Master Contracts; (3) Defendants paid the three employees the higher wages and provided the vacations and holidays specified in the Master Contract; (4) Defendants withheld union dues for the employees; and (5) Defendants submitted to audits of their books and records for 2013, 2014, 2015, and 2017, and paid any amounts found owing by the auditor.  This conduct more than sufficiently manifests Defendants' intent to adopt the CBA.  *See Gesualdi v. N. Star Concrete, Inc.*, No. CV144430SJFAYS, 2016 WL 7974111, at *8 (E.D.N.Y. Dec. 28, 2016), *report and recommendation adopted*, No. 14CV4430SJFAYS, 2017 WL 354188 (E.D.N.Y. Jan. 24, 2017) (numerous remittance reports, funds contributions, and submittal to audits provides

"ample evidence" to grant plaintiff summary judgment).

Defendants' principal explanation of their behavior is that they merely did the Union a "favor" by "informally" paying the employees under the Master Contract, which, they urge, does not amount to full adoption of the Master Contract for all covered work.  But whatever Defendants' *subjective* intention, it is their *objective* conduct that binds them to the Master Contract.  *See Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (in contract analysis, objective intent of parties, rather than "secret or subjective" intent, controls).  And courts have generally found unpersuasive a defendant's inaction, i.e., not signing the agreement, when it seems "reasonable that [the defendant] would have made some sort of express statement that, although it had been or would be complying with the CBA in many respects, it was not adopting or assuming that agreement."  *Serv. Emps. Int'l Union, Loc. 32BJ v. Coby Grand Concourse*, LLC, No. 04 CIV. 9580(CSH), 2006 WL 692000, at *4 n.2 (S.D.N.Y. Mar. 16, 2006).  Defendants cannot rely on post hoc disavowal.

Contrary to Defendants' assertion that they merely intended to cover specific drivers, rather than covered work, Defendants assumed the obligation to make Funds contributions for all covered work.  *See Gesualdi*, 2016 WL 7974111, at *9 (employer obligated to make contributions for work covered by the CBA);

10

*Trustees of the Buffalo Laborers' Pension Fund v. Accent Stripe, Inc.*, No. 01-CV-76C(SC), 2007 WL 1540267, at *6 (W.D.N.Y. May 24, 2007) (employer obligated to contribute for all employees performing covered work, regardless of union status). Defendants appear to have perfectly understood that the Bulk and Master Contracts covered different types of *work*. As UMEC President Anthony Peretta stated in his deposition: a driver performing covered residential work would "come under the master agreement"; "if we needed the drivers to make the residential deliveries, they were covered under the master contract"; and "everybody at that table that's in the industry, aside from the lawyers, knew what bulk drops meant." And from a labor relations perspective, it would make little sense if Defendants could dodge the Master Contract's obligations by having different employees perform covered retail work.

Accordingly, because Defendants adopted the 2010-13 and 2013-16 Master Contracts, Plaintiffs are entitled to an audit, and, if Defendants' employees were performing covered work, Plaintiffs are entitled to Funds contributions.

### 2.  *2016-19 Master Contract*

As to the 2016-19 Master Contract, the Court finds that by signing the 2017 MOA, Defendants adopted the Master Contract's obligations only as to the five drivers initially chosen from the seniority list. Although Defendants are incorrect

11

that either collateral estoppel or res judicata applies because Plaintiffs were not a party to the Arbitration,[4] *see Trustees of New York City Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, Apprenticeship, Journeyman Retraining Educ. & Indus. Fund v. Nicholas Indus. & Constr. Servs. Inc.*, No. 18 CIV. 2098 (LLS), 2019 WL 418497, at *1 (S.D.N.Y. Jan. 18, 2019) (rejecting res judicata argument), the Court finds the Arbitration Award's reasoning persuasive.

Arbitrator Edelman concluded that UMEC did not violate the MOA because of the MOA's language.  The MOA provided that the Master Contract "shall initially cover five (5) Drivers performing retail delivery work," which, Arbitrator Edelman concluded, meant that the only guarantee was that those five drivers would receive the Master Contract's higher pay.  Thus, the MOA operated as a ceiling, rather than a floor.  Arbitrator Edelman also reasoned that the parties were capable of crafting language covering all retail delivery work but chose not to.

Plaintiffs argue that Defendants fully adopted the Master Contract with their conduct and by signing the MOA.  The critical distinction for this period, however, is that the MOA's language specifically limits the Master Contract's rates and

---

[4] For this reason, as well as the Arbitration Award's consideration of the 2017 MOA, rather than Defendants' pre-2017 conduct, the Award does not bar all of Plaintiffs claims.

benefits to the initial five drivers.  Accordingly, the Court finds that the Defendants are bound to the Master Contract only as to the initial five drivers.

## B. Whether Defendants Are Alter Egos

The Court finds that Defendants are alter egos, which entitles Plaintiffs to seek records from all Defendants during their audit.  The alter ego doctrine provides the analytical hook to bind non-signatories to a CBA when the enterprises "have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010).  The doctrine has traditionally focused on "an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations." *Truck Drivers Local Union No. 807 v. Reg'l Import & Export Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991).

Plaintiffs have sufficiently shown that Defendants are alter egos.  As set forth extensively in Plaintiffs' papers, Defendants shared the same business agent, had substantially identical management and supervision, engaged in substantially identical business, and used the names of the three entities interchangeably.  Peretta testified that a UMEC manager assigned work to all drivers, and as this Court previously noted, UMEC Vice Chairman Nelson Happy ("Happy") appeared

"uninformed of the subsidiaries' relationship," could not "clearly distinguish the companies," and "could not even provide details about their ownership." *Demopoulos*, 2022 WL 2390986, at *2.

While "an intent to evade union obligations" is not a "necessary factor," it is "a germane or sufficient basis for imposing alter ego status." *UNITE HERE*, 629 F.3d at 288 (cleaned up).  Here, Defendants first distinguished between the entities at a late hour in this litigation, disclaiming UMEC's contractual obligations and stating that UAT was the sole employer of the three employees under the Master Contract.  Because Plaintiffs initially named only UMEC as a defendant and included UAP and UAT as aliases rather than separate defendants, UMEC appeared to be playing a "shell game" to avoid contractual obligations.  As this Court noted in allowing Plaintiffs to add alter ego allegations, Defendants introduced this confusion "likely in the hopes that all three entities could avoid liability to the Funds."  *See Demopoulos v. United Metro Energy Corp.*, No. 119CV05289FBRLM, 2022 WL 2390986, at *2 (E.D.N.Y. July 1, 2022), *reconsideration denied*, No. 19CV5289FBRLM, 2023 WL 2683012 (E.D.N.Y. Mar. 29, 2023).  This context, as well as Plaintiffs' evidence, suffices to show Defendants' alter ego status.

14

## C. Relief

Based on the preceding discussion, Defendants must contribute to the Funds for drivers performing covered work under the 2010-13 and 2013-16 Master Contracts and for the five drivers initially chosen under the 2016-19 Master Contract.  To determine whether Defendants were delinquent, Plaintiffs are entitled to an audit and an injunction directing Defendants to "permit and cooperate in the conduct of an audit of its records."  *Annuity, Welfare and Apprenticeship Skill Improvement & Safety Funds of the Int'l Union of Operating Eng'rs Local 15, 15A, 15C & 15D, AFL-CIO v. Lori Contracting, Inc.*, No. CV 2014-2467(RJD)(MDG), 2015 WL 1321672, at *3 (E.D.N.Y. Mar. 5, 2015) (internal quotation marks and citations omitted), *adopted*, 2015 WL 1359072 (E.D.N.Y. Mar. 24, 2015).

As to the scope of the audit, the audit must be "no broader in scope than necessary to achieve its objective and no more extensive than the scope of the trustees' authority."  *New York State Teamsters Conf. Pension & Ret. Fund v. Boening Bros.*, 92 F.3d 127, 134 (2d Cir. 1996).  Because Defendants are alter egos, Plaintiffs are entitled to audit all three Defendants' books and records to determine whether contributions are missing under the 2010-13 and 2013-16 Master Contracts.  However, because Defendants' obligations under the 2016-19 Master Contract are limited to the five drivers, Plaintiffs may only audit books and

records pertaining to those five employees.

At this stage, the Court does not express any opinion on whether Defendants are delinquent on any contributions.  Magistrate Judge Mann has already ordered that if the audit produces any dispute as to whether Defendants were delinquent in making contributions, additional discovery and a potential damages hearing could be required.  *See* ECF 16.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion is granted, and Defendants' motion is denied.  The Court issues an injunction allowing Plaintiffs to conduct an audit of Defendants' books and records for the time period from March 1, 2013, through December 31, 2018.  Because Defendants adopted the 2010-13 and 2013-16 Master Contracts, Plaintiffs have the right to Defendants' books and records to determine if Defendants failed to make Funds contributions for work covered by the Master Contract.  However, because the Defendants adopted the 2016-19 Master Contract only with respect to the initial five drivers, Plaintiffs' audit right is limited to those specific drivers.

**SO ORDERED.**


 _/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
May 23, 2024